UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-87 (ECT/BRT)

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SHOUA ISABELLE YANG, )<br>)<br>Defendant. ) | **GOVERNMENT'S POSITION REGARDING SENTENCING** |

The United States of America, by and through its attorneys, Charles J. Kovats, Jr., Acting United States Attorney for the District of Minnesota, and Matthew S. Ebert, Assistant United States Attorney, hereby submits this position paper as to sentencing factors.

As set forth below, the government respectfully requests that the Court sentence defendant Shoua Isabelle Yang substantially below the Guidelines range to a term of imprisonment at or near 15 months. Such a sentence avoids unwarranted sentencing disparities. It also provides a just and sufficient punishment for Ms. Yang's significant tax crime and affords adequate deterrence to others inclined to repeat her conduct.[1]

---

[1] Ms. Yang has moved the Court for a variance from the advisory Guidelines range of 27-33 months' imprisonment to a non-custodial sentence of 12 months' home confinement. (Dkt. 37 at 1, 5.) The government joins in Ms. Yang's request for a variance from the Guidelines range, but as discussed below, the government instead requests a custodial sentence at or near 15 months' imprisonment.

## I. BACKGROUND OF DEFENDANT MS. YANG'S TAX CRIMES

Ms. Yang stands before the Court having engaged in a multi-year string of conduct that resulted in a tax loss exceeding $1 million. In or about 2014, Ms. Yang together with business partner K.V. formed a company in the State of Minnesota named Atwork Staffing Inc. (Atwork Staffing), which they owned and operated jointly. (PSR ¶ 7.) Atwork Staffing's business included contracting with client companies to hire and pay workers for those companies. (*Id.*) Atwork Staffing was responsible for all payroll taxes including withholding from employee pay, the payment of withheld amounts to the Internal Revenue Service, the filing of true and correct Forms 941 to reflect the accurate withholding and payment of payroll taxes, and the payment of the employer's portion of Social Security and Medicare contributions. (*Id.*) In or about January 2017, defendant and K.V. dissolved their business partnership, and Ms. Yang became solely responsible for Atwork Staffing's operations, which included Ms. Yang filing Atwork Staffing's tax returns beginning with the second quarter of 2017. (*Id.* ¶ 8.)

After Ms. Yang took sole control of the temp business in early 2017, she understood that, as the owner and operator, she was personally responsible for ensuring the true, accurate, and timely payment over to the Internal Revenue Service of all corporate income and payroll taxes by Atwork Staffing. (*Id.* ¶ 9.) Despite that, during the tax years 2017 and 2018, Ms. Yang employed workers but caused Atwork Staffing not to properly withhold, account for and pay over accurate payroll taxes, including federal income taxes and Social Security and Medicare taxes. (*Id.*) She caused quarterly Forms 941 to be completed and filed that were willfully and

2

deliberately false, in that they did not report all employees employed by Atwork Staffing and did not report all the payroll taxes owed by Atwork Staffing. (*Id.*) Ms. Yang also caused Atwork Staffing to pay a portion of its employees' salaries in cash and not report the true payroll on the Forms 941 filed on behalf of Atwork Staffing. (*Id.*)

All Forms 941 filed for Atwork Staffing during the time frame of Ms. Yang's conduct from the second quarter of 2017 through the second quarter of 2018 were thus materially false. (*Id.*) Similarly, all of Ms. Yang's Forms 1120 corporate tax returns for Atwork Staffing were also false, as they underreported the gross receipts received from its clients, as well as the true amount of payroll expense for the wages paid to its employees. (*Id.*)

In total, Ms. Yang's tax fraud resulted in a total tax loss of $1,019,572.63 (*see* PSR ¶ 10), which is comprised of $295,591.51 in unpaid employment taxes from 2014-2017, and $723,981.12 in unpaid corporate taxes for tax years 2014-2017, as summarized below:

### Tax Loss

| QRT | ACTUAL WAGES REDUCED 7% | WAGES REPORTED PER 941 | UNREPORTED WAGES (wages - wages reported) | TAX (Unreported x 15.3%) |
|---|---|---|---|---|
| **2017** | | | | |
| 1 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2 | $300,533.92 | $24,196.25 | $276,337.67 | $42,279.66 |
| 3 | $411,328.00 | $27,678.56 | $383,649.44 | $58,698.36 |
| 4 | $586,170.38 | $42,566.88 | $543,603.50 | $83,171.33 |
| TOTAL | $1,298,032.30 | $94,441.69 | $1,203,590.61 | $184,149.36 |
| **2018** | | | | |
| 1 | $418,936.58 | not filed | $418,936.58 | $64,097.30 |
| 2 | $396,658.50 | $87,215.05 | $309,443.45 | $47,344.85 |
| TOTAL | $815,595.07 | $87,215.05 | $728,380.02 | $111,442.14 |
| total 2017-2018 | $2,113,627.37 | $181,656.74 | $1,931,970.63 | $295,591.51 |

**EMPLOYMENT TAX TOTAL** $295,591.51

#### Corporate Tax

| YEAR | TOTAL GROSS RECEIPTS DEPOSITED REDUCED 7% | (MINUS) REPORTED | UNREPORTED GROSS RECEIPTS | (MINUS) UNREPORTED WAGES | NET UNREPORTED RECEIPTS | (2)TAX DUE (34% of Net Unreported Receipts) |
|---|---|---|---|---|---|---|
| 2014 | $1,168,735.28 | $103,256.00 | $1,065,479.28 | $820,330.51 | $245,148.77 | $83,350.58 |
| 2015 | $2,025,990.05 | $175,165.00 | $1,850,825.05 | $1,281,871.79 | $568,953.27 | $193,444.11 |
| 2016 | $2,466,455.22 | $183,669.00 | $2,282,786.22 | $1,550,365.09 | $732,421.14 | $249,023.19 |
| 2017 | $2,250,875.61 | $232,679.00 | $2,018,196.61 | $1,435,363.54 | $582,833.06 | $198,163.24 |
|  | $7,912,056.16 | $694,769.00 | $7,217,287.16 | $5,087,930.92 | $2,129,356.24 | $723,981.12 |

**TOTAL CORPORATE TAX DUE AND OWING** $723,981.12

**TOTAL TAX LOSS (CORP AND EMPLOYMENT)** $1,019,572.63

## II. PSR AND THE ADVISORY GUIDELINES RANGE

### A. Sentencing Range

As set forth in the PSR, the base offense level is 20 for the offense of conviction pursuant to U.S.S.G. § 2T1.1(a)(1) because the tax loss ($1,019,572.12) is more than $550,000 but not more than $1,500,000. (PSR ¶ 18; see § 2T4.1(H).) The government understands that Ms. Yang is not contesting the tax loss amount of $1,019,572.12. The offense level is decreased by 3 levels pursuant to § 3E1.1(a) and (b) because of Ms. Yang's acceptance of responsibility. (*Id.* at ¶¶ 25-26.)

4

Thus, as calculated by the probation officer, the advisory sentencing guideline range with a criminal history category II, is 27-33 months of imprisonment. (*Id.* at ¶¶ 61, 63.) However, as noted in the Plea Agreement, the parties believed that Ms. Yang was in criminal history category I, which results in advisory sentencing guideline range of 24-30 months' imprisonment. (Dkt. 26 at 6.)

Pursuant to the Victim Witness Protection Act, 18 U.S.C. § 3663(a)(3), Ms. Yang shall pay restitution owed to the Internal Revenue Service in the amount of $1,019,572.12. (PSR ¶ 74.)

### III. SENTENCING FACTORS

The government respectfully requests that the Court sentence Ms. Yang to a term of imprisonment at or near 15 months, which represents a substantial downward variance from the advisory range of imprisonment. The government further requests that the Court impose no fine in order to prioritize restitution. As addressed below, the government respectfully asserts that a such a sentence is appropriate in light of the sentencing factors under 18 U.S.C. § 3553 most pertinent to this case—namely, (1) Ms. Yang's history and characteristics; (2) the nature and circumstances of the offense; and (3) the need for the sentence to promote respect for the law and to afford adequate general deterrence.

#### A. Ms. Yang's History and Characteristics

Ms. Yang's history and characteristics offer important mitigating factors. While her tax fraud is a serious and important part of her background, it is also not representative of the sum total of Ms. Yang's life. Throughout many other points, she

5

has demonstrated herself to be a supportive mother, wife, and employee, all in the face of some very difficult challenges. Ms. Yang's family is from Laos, and she spent much her childhood in refugee camps in Southeast Asia beginning in the late 1970s. (PSR ¶ 40.) Her mother died in one of those camps when Ms. Yang was a young girl. (*Id.*) Ms. Yang arrived in the United States in about 1985 when she was about age 8. (*Id.*) Ms. Yang's father remarried, and the PSR recounts a difficult upbringing marred by emotional and physical abuse within the family. (*Id.* ¶¶ 40-41.)

At age 16 (while a high school sophomore in Minneapolis), Ms. Yang gave birth to her first child with J.T. (*Id.* ¶ 43.) They remained together, got married, and had two more children together. (*Id.*) Tragically, J.T. was killed in 2004 when he was struck by a stray bullet while outside of a bar in St. Paul, leaving Ms. Yang as a single mother. (*Id.*) She thereafter engaged in a series of complicated and troubled relationships. (*Id.* ¶ 44.) Ms. Yang was most recently involved with a man with whom she now has a two-year old daughter. (*Id.*) That relationship is now over amidst allegations of abusive conduct, and there are multiple orders for protection. (*Id.*)

Despite these significant traumas and difficulties, Ms. Yang has clearly endeavored to support her family and continue her training and education. (*Id.* ¶¶ 50-52, 54-56.) These are important and positive characteristics about Ms. Yang and her life, which the government readily acknowledges and which should be considered in fashioning an appropriate sentence (which, the government respectfully submits is a sentence substantially below the Guidelines range). Indeed, as wrong and

inappropriate as it was, it appears that Ms. Yang's tax fraud was the result, at least, in part, of her need to keep financially afloat to support herself and her family. While that does not excuse or justify Ms. Yang's tax crime, it does perhaps offer some context.

In addition, the record makes clear that Ms. Yang has clearly and fulsomely accepted responsibility for her crime. She resolved her case quickly. The government also wants to make clear that Ms. Yang has been cooperative with law enforcement, not only about her own conduct, but she has also sought to make law enforcement aware of a range of other potential matters.

A custodial sentence of at or near 15 months, rather than a significantly higher Guidelines-range sentence, would appropriately account for her history and characteristics.

### B. Nature and Circumstances of the Offense

Ms. Yang's tax crimes cost the U.S. Treasury over $1 million in actual losses, which makes this a serious offense by any measure. Tax crimes are by no means a victimless crime. Such crimes are an affront to every American citizen who pays taxes lawfully and who relies upon the allocation of such taxes for vital services and benefits, including care for veterans and aid for education, to name but a few. The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from who they may be received." *Spies v. United States*, 317 U.S. 492, 495 (1943). Simply put, our system

risks substantial harm if citizens do not accord themselves truthfully concerning taxes, which is why tax crimes are so serious. *See United States v. Ture*, 450 F.3d 352, 357-58 (8th Cir. 2006) (recognizing that "'[t]ax offenses, in and of themselves, are serious offenses,'" and that "'a greater tax loss is obviously more harmful to the treasury and more serious than a smaller one'") (quoting U.S.S.G. § 2T1.1, cmt. background, and vacating and remanding for resentencing where the court sentenced a defendant responsible for $240,252 in tax loss to two years of probation, but not to imprisonment, from an advisory Guidelines range of 12 to 18 months' imprisonment).

Moreover, this type of tax crime is particularly hard to detect, and wastes resources on investigations like the one necessitated by Ms. Yang's conduct. This serious criminal conduct warrants an appropriate sanction, which the government respectfully submits necessarily includes some sort of a custodial term, albeit one substantially below the Guidelines range.

Although the government in no way minimizes the difficult circumstances that might befall Ms. Yang or her family as a result of her crime, the government respectfully asserts that the § 3553(a) sentencing factors weigh against the imposition of a non-custodial sentence. Moreover, if Ms. Yang were to receive a non-custodial sentence for tax fraud resulting in at least $1,000,000 in tax loss, then the government respectfully asserts that such a sentence could very well result in an unwarranted sentencing disparity. *See* 18 U.S.C. § 3553(a)(6); *see also* U.S. Sentencing Commission, *Statistical Information Packet: Fiscal Year 2020, District of Minnesota, available at* https://www.ussc.gov/sites/default/files/pdf/research-and-

8

publications/federal-sentencing-statistics/state-district-circuit/2020/mn20.pdf. More specifically, at Table 7, the U.S. Sentencing Commission's statistics show that in the most recent year (2020), in terms of months' imprisonment imposed in tax sentencings, the national mean and median was 15 and 12 months, respectively, and that in Minnesota specifically the mean and median was 12 and 9 months' imprisonment, respectively. *Id.* That national average, however, is largely based on defendants who had much lower tax loss than Ms. Yang. The median tax loss in 2020 cases was $339,4071, whereas here, Ms. Yang's tax loss was $1,019,572.12. *See* U.S. Sentencing Commission, *Quick Facts: Tax Fraud Offenses Fiscal Year 2020*, *available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud_FY20.pdf*. Accordingly, to avoid an unwarranted sentencing disparity, the government respectfully submits that a custodial sentence at or near 15 months (rather than a non-custodial sentence) is appropriate given the nature and size of Ms. Yang's tax fraud compared with other such offenders.

    **C.**    **The Need to Promote Respect for the Law and to Afford Adequate Deterrence**

Although there is minimal, if any, evidence in the record to suggest that Ms. Yang will commit additional tax crimes, the government submits that a sufficiently significant sentence is important nonetheless to deter others. The importance of affording deterrence and promoting respect for the law through appropriately significant sentences is especially important in tax crimes. Due to the substantial resources that are necessary to root out and investigate such conduct, criminal tax charges are not common. As the Sentencing Commission explained:

9

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. § 2T1.1 (intro. comment). The Eighth Circuit has emphasized the special need for deterrence in tax cases. *See Ture*, 450 F.3d at 357-58. Concluding that the district court's granting of a downward variance to probation was unreasonable, the Eighth Circuit noted that "[a]s the Guidelines explain, willful tax evaders often go undetected such that those who are caught ... evading nearly a quarter-million dollars in tax must be given some term of imprisonment." *Id*. at 358. The Eighth Circuit further reasoned that, in the case of those willfully violating tax laws, "[t]he goal of deterrence rings hollow if a prison sentence is not imposed...." *Id*.; *see also United States v. Carlson*, 498F.3d 761, 76-66 (8th Cir. 2007) (in rejecting as unreasonable a sentence that varied downward to a non-custodial sentence despite an advisory range of 18-24 months' imprisonment, the Eighth Circuit again emphasized the need for tax-related sentences to, among other things, "promot[e] respect for our federal tax laws" and "give the goal of deterrence adequate weight").

The need for general deterrence is greatest in cases involving particularly lucrative and difficult-to-detect tax crimes. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime

10

and hence the punishment required to deter it."); *see also United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a custodial sentence for a defendant in a tax case, in which sentencing court explained, among other things, that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it … Because of the limited number of criminal tax prosecutions relative to the estimated incidents of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines.")

Thus, in order to provide adequate general deterrence to others inclined to commit tax fraud, the government submits that a below-Guidelines sentence at or near 15 months is appropriate. More than that, it will convey clearly to would-be tax cheats that severe consequences will await them should they engage in similar conduct.

### IV.   CONCLUSION

For the reasons set forth above, the government respectfully recommends that the Court order Ms. Yang to pay restitution in the amount of $1,019,572.12, and sentence her below the Guidelines range to a term at or near 15 months' imprisonment to avoid unwarranted disparities and to afford sufficient general deterrence.

Dated: March 29, 2022                                       Respectfully submitted,

                                                            CHARLES J. KOVATS, JR.
                                                            Acting United States Attorney

                                                            */s/ Matthew S. Ebert*
                                                            BY: MATTHEW S. EBERT
                                                            Assistant U.S. Attorney